UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|                              |     |                      |
| ---------------------------- | --- | -------------------- |
|                              | )   |                      |
| **UNITED STATES OF AMERICA** | )   |                      |
|                              | )   |                      |
| **v.**                       | )   | **No. 08-CR-10321-DPW** |
|                              | )   |                      |
| **KINGSLEY T. EZE**          | )   |                      |
|                              | )   |                      |

## SENTENCING MEMORANDUM

Kingsley T. Eze ("the defendant") submits this memorandum of law in order to assist the Court in reaching the appropriate sentence in this matter. On April 9, 2010, a jury found the defendant guilty of one count of making a false statement to Medicare, in violation of 18 U.S.C. §1001, and ten counts of health care fraud, all in violation of 18 U.S.C. §1347. The jury acquitted Eze of the remaining five counts in the Indictment: to wit, three counts of health care fraud and two counts of aggravated identity theft, in violation of 18 U.S.C. §1028A. The underlying Indictment charged (1) that Eze made a false statement to Medicare by not disclosing in his Medicare Enrollment Application that another individual had a financial or ownership interest in his business and (2) that Eze submitted false reimbursement claims to Medicare. Had the defendant been convicted on either of the Identity Theft counts, he would have faced mandatory minimum two year prison sentences.

On June 21, 2010, the United States Probation Office prepared a Pre-Sentence Investigation Report ("PSR") analyzing, among other things, the defendant's criminal history and offense level in accordance with the United States Sentencing Guidelines ("USSG"). The PSR concludes that the defendant's total offense level is 28 and his criminal history category is

Category I.

A criminal history of Category I, coupled with a total offense level of 28, yields an advisory guideline range of 78 to 97 months in prison.[1] The defendant maintains that a reasonable measure of the advisory guideline range should instead be calculated on a total offense level of 18, with the calculation itself based upon the actual loss apportioned to the defendant of slightly over $300,000. Under that calculation, the advisory sentencing guidelines yields a sentencing range of 27-33 months of incarceration. The defendant, however, contends that the Court should exercise its considerable discretion and impose a sentence below the advisory guideline range. Indeed, he respectfully requests this Court consider sentencing him to a term of probation under whatever conditions this Court deems appropriate. In the alternative, the defendant maintains that a number of unique personal factors, as well as the context of the defendant's proven and relevant conduct, support the imposition of a sentence of imprisonment to a minimum security federal camp for a period of 24 months. Specifically relying upon *Booker*, *Gall*, and *Martin*, infra, and other relevant cases cited herein, as well as upon the various factors set forth in 18 U.S.C. § 3553(a), the defendant contends that the requested 24 month prison term sufficiently punishes him for his misconduct and, simultaneously, lessens the risk that neither he nor his family will suffer irreparable harm as a result of him receiving the disproportionate, cumulative, and enhanced sentence requested by the government.

## FACTS AND BACKGROUND

The defendant is a 32 years old citizen of the United States who was born in Kano,

---

[1] By contrast, the government argues that the Defendant's total offense level should be 30, with an advisory guidelines range of 97 – 121 months in prison.

Nigeria. He is the eldest of six children. He has two sisters; Fransica (Eze) Obodo, age 29, who resides in Quincy, MA with her husband and two children, and Linda Ogbodo, age 27, who lives in Abuja, Nigeria. Linda Ogbodo is employed as an accountant. He also has three brothers; Steven Eze, age 28, who also lives in Abuja, Nigeria, and is employed as a pharmacist; Geoffrey Eze, age 25, who lives with his brother Steven, and is employed as an engineer; and Patrick Eze, age 23, who is currently a graduate engineering student in Samara, Russia. The defendant's mother and late father, Christina and Sunday Eze, raised all six of their children in Nigeria in a very religious (Catholic) atmosphere. The defendant enjoyed a relatively "middle class" upbringing in Nigeria, where both his parents were employed and able to support the family. This stable upbringing afforded the defendant and his five siblings the opportunity to attend private schools in Nigeria. As a result, the defendant graduated from High School in Nigeria in 1996. From there, he attended Enugu State University of Science and Technology in Nigeria and was enrolled in a civil engineering program. He is fluent in English but maintains a proficiency in his native language, Igbo. In 1998, at the age of 20, the defendant applied for, and obtained, a Green Card allowing him to lawfully enter, and reside in, the United States. He obtained his Green Card after he and his family had entered into a lottery offering "chances" to gain legal entry into this country. He was the only member of his family to be awarded this highly sought after privilege. He left his home and his family and entered the United States on May 26, 1998. On May 17, 2002 he became a Naturalized United States Citizen. The defendant describes that day as the "most wonderful day in his life".

Upon his entry into the United States, the defendant resided in the Houston, Texas area for a short period of time. There, he was introduced to a person he believed to be a prominent businessman in Houston's sizeable Nigerian community, Aghaegbuna Odelugo, a/k/a Ike,

3

("Odelugo").  Shortly thereafter, the defendant joined the United States Navy (in September of 1998) as a means of showing both gratitude and appreciation for his new country.  That same year, the defendant's father was diagnosed with kidney failure and was no longer able to support his family.  His father eventually succumbed to the illness and died in 2001.  In accordance with his culture, the defendant immediately assumed the leadership of his family upon his father's death.  This responsibility included any and all financial support the defendant was able to provide for his mother, sisters, and brothers in Nigeria.  As a result, the defendant began sending money home to Nigeria via Western Union on a regular basis in fulfillment of his family obligations.  Much of the money he sent was used to support the continuing education of his siblings.

During the defendant's tenure in the United States Navy, he was assigned to various installations in the United States.  He eventually received training as a combat medic at the Service Medical School in Great Lakes, Illinois and, after completing his training, served at several bases/facilities in the United States, including in Texas and North Carolina.  Subsequent to that, he served several overseas tours of duty in Japan, Kuwait, and Iraq.  His deployment to Iraq involved service in a combat zone and with Operation Iraqi Freedom.[2]  During his deployment in Iraq, and while involved in hostile action, the defendant incurred a partial disability as a result to his exposure to gunfire and artillery.   The defendant left active duty from the United States Navy in 2004, receiving an honorable discharge from the service as a Hospital Corpsman.  While in Iraq, his unit also received a Presidential Citation.  From 2004 to 2006, the defendant remained on inactive duty with the Navy.  (Pertinent portions of the

---

[2] He also attended classes at Missouri's Park University while serving in the Navy.  Those classes were offered to military personnel via satellite.

defendant's U.S. Navy record detailing his honorable discharge, receipt of his unit's Presidential Citation, and other individual awards and accomplishments are attached hereto as Exhibit A).

After his discharge from the Navy, the defendant moved back to the Houston area. There, he reacquainted himself with, and was befriended by, Odelugo.  The defendant knew that Odelugo was a prominent successful businessman in the Nigerian community around Houston.  Odelugo ran and maintained retail cell phone companies, an ambulance service, and other business interests.  The defendant was often entertained by Odelugo, who became a close confidant and father figure to him.  The defendant's perception of Odelugo as a man of success and means was reaffirmed by the trappings of success and comfort that surrounded him. Odelugo became both mentor and friend to the defendant and often expressed admiration and pride regarding the defendant's extensive military service to the United States.  In turn, the defendant often shared with Odelugo his desire to continue his education and enter the medical services profession, as well as his desire to apply to the Massachusetts College of Pharmacy and Health Sciences ("Mass College of Pharmacy") in Boston, Massachusetts.  Odelugo encouraged these aspirations and, in conjunction with his life plan, the defendant moved to the Boston area in 2004, settling in Quincy, Massachusetts.

When the defendant moved to Quincy, he was able to gain employment at Brigham and Woman's Hospital in Boston as a Lead Medical Assistant.  He also enrolled in classes at Quincy College because he needed to establish an educational resume that would enable him to gain entrance to the Doctor of Pharmacy Program at the Mass College of Pharmacy.  However, he found both his school and work schedules to be incompatible and, for a period, was

unemployed.  He was eventually able to secure a security job in the Boston Area that was more compatible with his educational obligations and demands.

In 2005, the defendant successfully petitioned the U.S. Immigration Service for his mother to gain lawful entry to the United States and reside with him as a resident alien.  The defendant paid the associated costs and fees for his mother's relocation from his own pocket, incurring personal debt and losing his car via repossession as a result.  However, his sacrifice and efforts resulted in her gaining lawful entry and, shortly thereafter, his sister, Fransica, joined both him and his mother in the United States.  At first, both his mother and sister lived with him at his Quincy residence.  During this time, he continued not only to support his mother and sister directly, but also his four remaining siblings in Nigeria, whenever circumstances would allow.

The defendant ultimately applied for, and was accepted into, the Doctor of Pharmacy Program at the Mass College of Pharmacy, matriculating in the fall of 2006.  Prior to starting the Pharmacy program, he returned to Houston, where he again spent time with his benefactor and mentor, Odelugo.  In fact, the defendant lived with Odelugo during this time at Odelugo's home in Sugarland, Texas.  It was during this time that Odelugo first made the suggestion that the defendant open a DME business in Massachusetts.  The defendant knew very little about business in general and DME sales in particular, and did not realize that the suggestion included the perpetration of fraud or that Odelugo was already conducting a series of similarly fraudulent businesses throughout Texas and the United States.

The defendant returned to Quincy and began his program in Pharmacy School.  Shortly after, he made the ill fated decision to enter into the DME business at the behest,

6

encouragement, and direction of Odelugo.  The defendant's decision to do so was, sadly and fatally, a product of his upbringing, his environment, his trust of Odelugo and his need to fulfill his role as "breadwinner" as the head of his family unit.  In entering into the DME business, the defendant trusted that Odelugo, whom he viewed as a successful and savvy businessman, was providing him an opportunity to fulfill all of his goals through financial stability.   The defendant believed that the DME business proposed by Odelugo could pay for his own education, the education and continued support of his siblings, and the support of his family in Boston in accordance with his duties and responsibilities as head of his family.    This last fact is evidenced by the defendant's continued regular transfer of much of the money he obtained from his involvement in the DME business back to his siblings in Nigeria.  (See Exhibit B).  As the defendant testified at trial, he believed all of Odelugo's representations about the DME business.  Still, he now understands that having done so does not absolve him of responsibility for the fraudulent nature of Kings Enterprize and the specific acts he committed in connection therewith, and he fully comprehends that he should have been significantly more diligent before agreeing to enter into a business relationship with Odelugo and less "blind" to complaints of beneficiaries and regulators once that business relationship began.  He also realizes that he should have questioned the amounts of money he was receiving from the business despite minimal effort and attention on his own end.   Nonetheless, it should be stressed that the defendant was simultaneously involved in a very intensive and demanding educational program that required a tremendous amount of his time, attention, and resources for upwards of 8 – 12 hours a day, seven days a week, including class-time and study.  Moreover, it was clear from the evidence adduced at trial that Odelugo masterminded the entire operation and was able to convince the defendant that the operation was legitimate.

Again, all of this is by no means an absolution for the defendant's conduct but it did create a "perfect storm" in that the defendant was so engrossed with his academic demands, as well as his continuing obligation to provide financial support to his immediate family, that the reality of the business he was involved in was never grasped until he was confronted by regulators with the discrepancies in the business' operations. That he continued to ignore the realities thereafter, and/or that he attempted to correct them himself, is not only a decision he will regret forever, but also a decision for which he is both profoundly sorry and now ready to be held accountable by this Honorable Court.

The defendant was initially contacted by law enforcement officials in the late fall of 2007. As a result of the increased stress that followed, as well as the realization that he was now the target of a federal criminal investigation and prosecution, his grades began to suffer. The Doctor of Pharmacy program is very intensive and demanding in and of itself. The increasing stress of the ongoing investigation had a discernible material effect on his academic progress. As a result, in January of 2009, while this matter was pending trial, the defendant was transferred from the Doctor of Pharmacy Program to the Pharmaceutical Marketing and Management Program, with an expected graduation date of late May 2010. On May 6, 2010, 2½ weeks after his trial concluded and mere weeks from his scheduled graduation, the defendant was expelled from the Mass College of Pharmacy solely because of his convictions in this case.

The defendant is currently residing at the same address in Quincy, Massachusetts he resided at during the underlying investigation. He still lives there with his mother (age 49). She is presently attending Simmons College and working to obtain a degree in nursing. Since

his indictment, the defendant has been on conditional release, subject to continued electronic monitoring.  As a result of his conduct, the defendant was not able to obtain the college degree he worked for so long for at the Mass College of Pharmacy.  He is fully aware of the likelihood, and inevitability, of incarceration resulting from his conduct.  Despite this, he has maintained a positive outlook and plans on seeking readmission into the military upon completion of his sentence (should they accept him despite his felony convictions) in order to make further amends for his conduct.

## ARGUMENT

The defendant respectfully asks the Court to impose a sentence of 24 months of imprisonment at a minimum security prison camp within the Northeast region.  In seeking a sentence 3 months below what he believes should be the applicable advisory guideline range sentence, and 42 months below what Probation considers the range to be, the defendant notes that the United States Sentencing Guidelines, as promulgated by the United States Sentencing Commission, no longer bind federal courts. *United States v. Booker, 543 U.S. 220, 259 (2005)*. Indeed, the United States Supreme Court's landmark *Booker* decision declared the mandatory provisions of the USSG unconstitutional. *Id. Booker*, however, reaffirmed a sentencing court's duty to sentence a defendant in accordance with those provisions of the Sentencing Reform Act specified in 18 U.S.C. § 3553(a).

The § 3553(a) factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant, (2) the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment, to afford adequate deterrence, to protect the public, and to provide the defendant with needed

educational or vocational training or medical care, (3) the kinds of sentences available, (4) the kinds of sentence and the sentencing range established by the United States Sentencing Guidelines, (5) any pertinent policy statement, (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and (7) the need to provide restitution to any victim of the offense. *United States v. Robinson, 433 F.3d 31, 35 (1st Cir. 2005)*. The district court, while not bound by the guidelines, still must consult and consider them when imposing sentence. *Booker, 543 U.S. at 264*. Courts of appeals cannot disturb a district court's sentence unless the appellate court finds that sentence unreasonable. See *Id.* The United States Supreme Court clarified post-*Booker* sentencing procedure in *Gall v. United States, 128 S. Ct. 586 (2007)* where the *Gall* Court indicated that when sentencing a defendant,

[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark. The Guidelines are not the only consideration, however. Accordingly, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, the district judge should then consider all of the § 3 553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented. If he decides that an outside-Guidelines sentence is warranted, he must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance. We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one. After settling on the appropriate sentence, he must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing.

*128 S. Ct. at 596-597* (internal citations and quotations omitted).

While the First Circuit has noted that sentencing courts must employ "an increased degree of justification commensurate with an increased degree of variance", from the advisory sentencing guideline range, it has also held that under a post-*Gall* rubric, "there is no stringent mathematical formula that cabins the exercise of the sentencing court's discretion. *United*

*States v. Martin, 520 F.3d 87 (1st Cir. 2008).* "Indeed, after *Gall*, the sentencing inquiry-once the court has duly calculated the GSR-ideally is broad, open-ended, and significantly discretionary. At that point, sentencing becomes a judgment call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." *Id. At 91-92* (internal citations and quotations omitted)(affirming a 91-month downward deviation from the advisory sentencing guideline range).

Here, the defendant asks the Court to exercise its significant discretion and sentence him to a 24 month term of incarceration. The defendant recognizes the wrongfulness of his conduct and acknowledges that his criminal actions require him to pay a significant debt to society. He stands ready to pay that debt. Nonetheless, a 24 month sentence is significant for a former Navy combat veteran, with no prior criminal record, who personally "netted" approximately $300,000 as a result of his criminal conduct.[3]   It punishes him proportionately to the crimes he committed and sends a powerful message to others who might be inclined to engage in the same type of fraud that such conduct will not be tolerated. He realizes he not only deserves punishment, but actual incarceration. He simply asks that this Court not impose a sentence that unnecessarily penalizes his family or jeopardizes his ability to return to society as a productive citizen.

This is a case where the government, in requesting a disproportionately harsh sentence for the conduct established, is attempting to treat the defendant as both leader and mastermind of this Medicare Fraud operation, notwithstanding clear and convincing evidence to the contrary. In so doing, the government is, respectfully, engaging in a

---

[3] Evidence adduced at trial established that the defendant reimbursed Medicare approximately $66,000 of the total $308,095 he reported on his 2007 income tax return.

"willful blindness" of its own.  While the defendant accepts the wrongfulness of his conduct

he was, to a great extent, taken advantage of by an individual (Odelugo) with whom he had

developed a mentor type relationship and who was someone he trusted unconditionally.  As

the government knows, Odelugo was the individual who established the defendant in the

DME business.  Odelugo gave the defendant instructions and direction on how to do

everything.  Odelugo provided start up monies to open the business.  Odelugo instructed the

defendant on how to obtain a Medicare provider number.  Odelugo obtained all of the files

that were utilized in submitting bills to Medicare, as well as the doctors' signatures that

came with them.  Odelugo paid "runners" to obtain the necessary patient information and

medical authorization.  Odelugo hired the billers who submitted all the information to

Medicare in Kings Enterprize's name.  Odelugo instructed the billers on what services to

bill for and for how much.  Odelugo obtained all of the equipment that was delivered.

Odelugo hired the people to complete the deliveries and obtained the requisite delivery

documentation.  When there were problems encountered, the defendant was consistently

advised by Odelugo that the problems were minor and that Odelugo would resolve them.

Odelugo was the individual who utilized the same patient information and directed that

services were to be billed by other DME companies that Odelugo controlled.  Odelugo

controlled and directed over ten other DME companies similar to Kings Enterprize. [4]

---

[4] On October 29, 2008 Special Agent Erin Fuller of the United States Department of Health and Human Services, Office of Inspector General testified before the Federal Grand Jury that during her investigation of Kings Enterprize she determined that Odelugo ran a series of similar DME companies and was the mastermind behind Kings Enterprize and other comparable companies.  She testified that "He (Odelugo) did all the work as he did with Kings Enterprize"... "He gets an individual, like in this case, Kingsley Eze, to start a DME company and then the role of Odelugo is to get all the orders, provide all the equipment to the beneficiaries, hire people to deliver the equipment, hire people to do the billing and everything for the company, but the company would be in the name of another individual.  For King's Enterprize it was Kingsley Eze, the defendant."  *Grand Jury Transcript, October 29, 2008, Testimony of Erin Fuller, p.9-13.*  The defendant considered calling S/A Fuller during its case-in-chief but elected

Obviously the defendant's naivety does not absolve him from responsibility. He fully understands and accepts that he is responsible for the acts that he will be punished for committing. Still, the defendant's role, when compared to that of Odelugo, should neither be ignored nor over-exaggerated; which is what the government appears to be doing in requesting the statutory maximum penalty.

The defendant's family circumstances also present a compelling reason for the sentence herein requested. While losing him for 24 months undoubtedly will be difficult for the defendant's family, losing him for 78 months will be insurmountable. The defendant originates from a deeply religious and traditional family environment. Upon the untimely death of his father, the defendant was unexpectedly thrust into a position of leadership and responsibility for the welfare of all of his siblings and his mother. That role was not one that the defendant was ready to undertake. His family, in traditional fashion, has looked, and continues to look, to him for support and guidance. Since his arrival in this country as a beneficiary of the "Green Card lottery" the defendant has provided continued financial and emotional support for his family, often times to his detriment. This unexpected responsibility was very burdensome. The opportunity offered by Odelugo and the DME business was an answer to the demands of his family responsibilities. It provided the defendant with the opportunity to provide financial stability and the ability to continue his very demanding educational duties. Even during his involvement in the DME business, the evidence confirmed that a large bulk of the proceeds he derived from his share were transferred to his family in Nigeria for their support. The defendant

---

not to, based upon the government's objections. The defendant believes that her testimony is relevant for sentencing purposes**.**

was able to sponsor the entry of his mother and his sister into this country and has provided them with continued support.  To this day, the defendant remains a vital entity in the family structure and the fulcrum for emotional support and stability of his mother and siblings.     (See various attached letters of support, marked Exhibit C, 1 through 9).

The defendant recognizes that, ultimately, his own misdeeds and conduct are the cause of any misfortune he or his family suffers. He, however, most respectfully asks that the Court not sentence him solely upon the harm he caused, but also consider his significant positive contributions to society in the past.  Almost immediately upon entry into this country, the defendant voluntarily enlisted in the armed services.  He served his newly adopted country honorably and with distinction.  His service included deployment into active combat arenas and exposed him to hostilities that resulted in a partial disability.  While his conviction will assuredly exclude him from working in the health care industry, it should be emphasized that he has already been punished by his summary expulsion from his pharmacy program as a result of his conviction(s) and has, by his own actions, not only destroyed his educational dreams and endeavors, but also a promising career opportunity as an ex-Navy Corpsman in the rapidly growing health care industry.  In facing this devastating effect upon his future, the defendant has indicated he intends to try to make amends by returning to a military career upon completion of his sentence.  He believes that in that environment he can make a positive contribution to society, further repay his now considerable debt to society, and gradually rebuild the life that once held so much promise for him.

As noted, the government, in this case, has asserted that the advisory guidelines for the defendant should be (based upon a total offense level of 30) a sentence of 97 to 121 months. Again, and respectfully, this assertion for a first time offender with no criminal record who has

committed a non-violent crime, and who personally "gained" approximately $300,000 from his criminal conduct, is both disproportionate and extreme. The government will assert that the loss amount in this case, coupled with their perception that the defendant obstructed justice, mandates a sentence approaching the statutory maximum. The government fails in their credibility in asserting such a recommendation. One cannot help but to wonder if this assertion is more about the defendant's country of origin than it is about the defendant's actual proven conduct.

Moreover, up to the time of this trial, the government virtually ignored the acts of Odelugo[5] and appears now to be punishing the defendant for asserting his Constitutional right to a trial. The end result of their calculations under § 2B1.1 leads to an absurd result of a first-time, non-violent fraud offender being subject to a sentence as high as, and sometimes even higher than, those imposed on the most violent offenders (*e.g.*, individuals sentenced for murder-for-hire, armed robbery, arson, volume drug importation/distribution, and even voluntary manslaughter). *Compare* USSG § 2B1.1 (2001) (offense level of 28 based only on base offense level and amount of financial loss over $2.5 million) *with* USSG § 2A4.1 (2001) (offense level of 24 for kidnapping), USSG § 2K1.4 (2001) (offense level of 24 for arson creating substantial risk of death or serious bodily injury), USSG § 2D1.1 (2001) (offense level of 24 for trafficking in over 100 kg of marijuana) *and* USSG § 2A1.3 (2001) (offense level of 25 for voluntary manslaughter). Moreover, the mean federal sentence of imprisonment for fraud convictions of defendants in the United States was 21.6 months in 2008. *United States Sentencing Commission, Sourcebook of Federal Sentencing Statistics, 2008, Table 13.* In 2009, the mean sentence for fraud was 21.9 months. *United States Sentencing Commission,*

---

[5] Other than simply referencing him as an unindicted co-conspirator in the defendant's underlying indictment.

*Sourcebook of Federal Sentencing Statistics, 2009, Table 13.*  Yet here, in 2010, the government urges a sentence of up to the maximum ten years in prison for an individual who realized an actual gain from his proven criminal conduct of approximately $300,000, a sum that was 75% less than that received by the known master-mind of the underlying scheme, whom they originally neglected to charge.

While it's true the Sentencing Commission has made the amount of loss the determinative factor in the offense level calculation for fraud offenders, loss amount is a highly imperfect measure of the seriousness of the offense. *See United States v. Adelson, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006)* (criticizing "the inordinate emphasis that the Sentencing Guidelines place in fraud on the amount of actual or intended financial loss" without any explanation of "why it is appropriate to accord such huge weight to [this] factor[ ]"). The specific amount of loss is often "a kind of accident" and thus "a relatively weak indicator of [ ] moral seriousness . . . or the need for deterrence." *See United States v. Emmenegger*, 329 F. Supp. 2d 416, 427-28 (S.D.N.Y. 2004). Most defendants do not set out to defraud a specific amount of money; rather, the amount of loss is dependent on the security procedures in place and the point in time when the ongoing fraud happens to be detected. *Id.* As the *Emmenegger* court explained: "Had [the defendant] been caught sooner, he would have stolen less money; had he not been caught until later, he would surely have stolen more." *Id.*  In short, the Commission failed to fulfill its institutional role of considering empirical evidence when making the amount of loss central to its fraud guideline and then repeatedly increasing the amount of points imposed for specific loss amounts. The resulting fraud guideline is, therefore, entitled to no unusual/strict deference. Instead, it is respectfully submitted that this Court should look to all of the § 3553(a) factors, and the empirical data not considered by the Commission, in fashioning a sentence "sufficient,

but not greater than necessary", to fulfill the various purposes of sentencing.

## A. Several aspects of the defendant's offense, as well as his individual characteristics, support a variance.

A sentencing court "may not presume that the Guidelines range is reasonable," *Gall, 128 S. Ct. at 596-97*, and cannot "require 'extraordinary circumstances to justify a sentence outside the Guidelines range." *United States v. Bolds, 511 F.3d 568, 580-81 (6th Cir. 2007)*. The district judge 'must [instead] make an individualized assessment based on the facts presented' and upon a thorough consideration of all of the § 3553(a) factors." *Id*. at 580 (quoting Gall, 128 S. Ct. at 597). Although the Sentencing Commission "fills an important institutional role" in promulgating the Guidelines, the sentencing judge "has greater familiarity with the individual case and the individual defendant before him . . . [and] is therefore in a superior position to find facts and judge their import under § 3553(a) in each particular case." *Kimbrough v. United States, 128 S. Ct. 558, 574 (2007)* (internal quotations and citations omitted). Though this Court has discretion to deviate from the Guidelines in even a Medicare fraud case, a variance is especially appropriate in this case because of the following mitigating aspects of his individual history and characteristics.

### 1. *The defendant's primary motivation was not greed.*

A defendant's motive for committing his crime is relevant at sentencing. *See, e.g.*, *Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993)*. Under a court's mandatory analysis of the § 3553(a) factors, motive is part of the "nature and circumstances of the offense" and must be considered. *United States v. Mahan, 2007 WL 1430288, at 3 (10th Cir. 2007)* (unpublished)

(finding sentence procedurally unreasonable where district court refused to consider defendant's stated motive for possessing unloaded shotgun, *i.e.*, that he had just been violently beaten by three men and sought to defend his wife).  Accordingly, a number of courts have granted departures or variances where the fraud the defendant was motivated by involved something other than a desire for profit of personal financial gain.  *United States v. Milne, 384 F. Supp. 2d 1309, 1310-11 (E.D. Wis. 2005)* (granting variance below guidelines' recommendation where "defendant did not take the bank's money out of greed or a desire to live a lavish lifestyle, [but in effort] to keep a sinking business afloat);  *United States v. Ranum, 353 F. Supp. 2d 984, 990 (E.D. Wis. 2005)* (considering mitigating evidence that defendant in bank fraud case had "not act[ed] for personal gain or for improper personal gain of another").

The defendant in this case does not dispute, or ask this Court to ignore, the fact that he used some of the misappropriated funds for personal expenditures.  The evidence established at trial showed he did purchase two used motor vehicles (at auction).  However, the evidence also demonstrated that he spent or transferred most of the funds received from Medicare in order to support his family and fulfill the obligations he assumed after the untimely and unexpected death of his father.  Accordingly, his initial motive should be viewed not as one of personal greed, even though, at some point, his own desires entered into the equation.  At bottom, though, the bulk of the appropriated funds were used to support his family and his and their education.  Moreover, the defendant did return over $66,000.00 of the funds to Medicare after the problems in Ohio became apparent[6] and he never sought to obtain monies from any of the beneficiaries

---

[6] Regardless of whether or not the funds were returned upon the defendant's own initiative, or at the request of HHS/Medicare, it cannot be disputed that funds he did return constituted a substantial amount of money. Furthermore, HHS/Medicare's position that audited requests for refunds cannot be labeled "voluntary" does not mean that the defendant did not voluntarily comply or cooperate, to the extent he was financially able, when such requests were made.

themselves.  Indeed, none of them incurred any personal loss.

The defendant always disbelieved that Odelugo would lie to him and/or involve him in illegal activity.  This naivety was the defendant's downfall.  Again, the defendant understands that this does not excuse his conduct, but after it became clear to him that Odelugo had involved him in illegal conduct, he cooperated with investigators and provided them with all the information and documentation they requested.  Also, the evidence suggests that for a considerable length of time he genuinely believed that this business was legitimate.  As a result, the defendant's case is distinguishable from the run of the mill fraud case in which a defendant misappropriates large sums of money for the sole purpose of supporting a lavish lifestyle.  Though the defendant's fraud got increasingly out of hand as it progressed, his initial motive was to obtain an income source for him and his family while he pursued his educational goals in a very demanding medical program.   He believed, however unrealistically, that the business was legitimate and he had no idea, until the billing began how extensive the submissions would be.  He had, or believed he had, no control over the billings.  He was not by any means an individual who was accomplished in any business endeavor.   Odelugo knew the business and consistently informed the defendant that any problems that arose were minor and that he (Odelugo) would resolve them.  It is respectfully submitted, therefore, that the Court should take this entire picture into account in fashioning an appropriate sentence.

### 2. As a 32 year-old, first-time offender, the defendant has an exceptionally low risk of recidivism.

Both the age of an offender and his/her first offender status are powerful predictors of the likelihood of recidivism. Indeed, the Sentencing Commission has itself recognized that (1)

recidivism rates decline dramatically with age, and (2) first-time offenders are even less likely to reoffend than defendants with a limited criminal history who also fall within Criminal History Category I.  *See* U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,* at Ex. 9 (May 2004) [hereinafter *Measuring Recidivism Report*]; U.S. Sentencing Commission, *Recidivism and the "First Offender,"* at 13-14 (May 2004) [hereinafter *First Offender Report*].   The Commission's research has, for example, demonstrated that a 20-year-old defendant in Criminal History Category I has a 29.5% chance of reoffending, while a 32-year-old defendant with the same criminal history has only a 14.6% chance of recidivating.  *Measuring Recidivism Report* at Ex. 9.  Offenders with a college education have just an 8.8% chance of reoffending and first time offenders convicted of fraud type crimes reoffend at only 9.3% rate. *Id*. at Ex. 10 and 11.  With respect to first offenders, the Commission has found that offenders with zero criminal history points have a recidivism rate of just 11.7%, while offenders with just one criminal history point have double the recidivism rate at 22.6%. *First Offender Report* at 13-14.

Despite these clear and compelling findings, the Commission has failed to revise the Guidelines to take either the age or the first-offender status into account.  The Commission clearly recognized the advisability of revising the Guidelines to take these factors into account.  *See First Offender Report* at 1-2 (identifying goal of "refin[ing] a workable 'first-offender' concept within the guideline criminal history structure); *Measuring Recidivism Report* at 16 (noting that "[o]ffender age is a pertinent characteristic" that would "improve [the] predictive power of the guidelines "if incorporated into the criminal history computation").   But, in the years since publishing its *Fifteen Year Report*, the Commission has taken no action toward implementing such revisions.  In response to the Commission's inaction, a growing number of

courts have themselves taken both age and first-offender status into account when fashioning an appropriate sentence under 18 U.S.C. § 3553(a). *See, e.g.*, *United States v. Darway, 255 Fed. Appx. 68, 73 (6th Cir.2007)* (upholding sentence in child pornography case as reasonable where district court granted downward variance on basis of defendant's first-offender status); *United States v. Hamilton, 2009 WL 995576, at \*3 (2d Cir. Apr. 19, 2009)* (holding that "the district court abused its discretion in not taking into account policy considerations with regard to age recidivism not included in the Guidelines"); *United States v. Holt, 486 F.3d 997, 1004 (7th Cir. 2007)* (affirming a below-guidelines sentence where the district court's only reason for the variance was that the defendant's age made it unlikely that he would again be involved in another violent crime); *United States v. Cabrera, 567 F. Supp. 2d 271, 279 (D. Mass. 2008)* (granting variance because defendants, like *Cabrera*, "with zero criminal history points are less likely to recidivate than all other offenders); *Simon v. United States, 361 F. Supp. 2d 35, 48 (E.D.N.Y. 2005)* (explaining that a sentence of 262 months – as opposed to Guidelines sentence of 324 to 405 months – constituted "sufficient, but not excessive, deterrence" for 44-year-old defendant); *United States v. Nellum, 2005 WL 300073 at 3 (N.D. Ind. Feb. 3, 2005*) (explaining that age of offender is relevant to § 3553(a) analysis, even if not ordinarily relevant under the Guidelines, and granting variance to 57-year-old defendant); *United States v. Ward, 814 F. Supp. 23, 24 (E.D. Va. 1993)* (granting departure based on defendant's age as first-time offender since guidelines do not "account for the length of time a particular defendant refrains from criminal conduct" before committing his first – *i.e.*, the charged – act).

Here, the defendant is 32 years old and has no prior history of any criminal behavior. The Sentencing Commission has recognized that an offender within his age range – and with his lack of any criminal record – is extremely unlikely to recidivate. Given the defendant's

extraordinarily low risk of recidivism, even the guidelines range sentence of 78 to 97 months calculated by Probation is simply greater than necessary to protect the public from the small chance of him committing future crimes. Such a lengthy sentence would only serve to provide "just deserts" at a very high cost to the American taxpayer while hindering the defendant's ability to make restitution to the victim.  Moreover, because it is the certainty, not the severity, of punishment that best serves as a general deterrent to the public at large, a two year sentence, while substantially below the advisory range, more than adequately fulfills § 3553(a)(2)(B)'s goal of "afford[ing] adequate deterrence to criminal conduct."

### 3. The defendant's criminal conduct was aberrant in light of the years he lived as a law-abiding citizen.

In the Sentencing Reform Act, Congress directed the Sentencing Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j).  In response, the Commission "redefin[ed] 'serious offense' in a way that was entirely inconsistent with prior practice, and not at all based on any real data or analysis," and thereby substantially increased the incarceration rate for non-violent first offenders above pre-guidelines rates. *United States v. Germosen, 473 F. Supp. 2d 221, 227 (D. Mass. 2007).*  The Commission acknowledged that the guidelines failed to address "single acts of aberrant behavior that still may justify probation at higher offense levels through departures." *See* USSG Ch. 1, Pt. A, intro comment. § 4(d). Seizing on the Commission's statement, courts stepped in to fill in the gap, creating their own

downward departure for offense conduct that constituted aberrant behavior.  Though some circuits limited the availability of their aberrant conduct departure to defendants guilty of a "spontaneous, thoughtless, single act involving lack of planning," *see, e.g.*, *United States v. Marcello, 13 F.3d 752 (3d Cir. 1994)*, other courts took a more expansive approach by looking at the totality of the circumstances and not automatically excluding defendants whose uncharacteristic conduct was comprised of more than a single, unplanned criminal act. *See, e.g.*, *United States v. Grandmaison, 77 F.3d 555 (1st Cir. 1996).*

In 2000, the Commission finally adopted its own aberrant conduct departure. *See* USSG §5K2.20.  In doing so, however, the Commission failed to fulfill its institutional role of considering empirical data or the many policy questions relevant to how first-offenders should be sentenced.  Instead, the Commission simply reviewed the approaches already being taken by the courts, considered general recommendations from the criminal justice community, and then elected to adopt a restrictive approach that limited eligibility to "single criminal occurrence[s] or single criminal transaction[s]." *Id.*  The Commission "*did not* study the relationship between the varying court definitions or aberrant behavior and the statutory purposes of sentencing," "evaluate alternatives to incarceration for non-violent first offenders," or explain why it adopted various exclusions or definitions." *Germosen, 473 F. Supp. 2d at 228-29*.  In a conclusory manner, the Commission merely "announced *what* it had done." *Id. at 229*.  Because the Commission failed to fulfill its institutional role, this Court has the authority to reject § 5K2.20's restrictions on the availability of the aberrant conduct departure.  *See Spears v. United States, 129 S. Ct. 840, 843 (2009)* (explaining that when the Commission fails to fulfill its institutional role, a district court can vary from the guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a

particular case").

Here the defendant lived a law-abiding life until he engaged the conduct that resulted in his convictions on Medicare fraud.  He was regarded as a loving son.  He is a military veteran, a caretaker, and a good person.  He did not engage in his fraudulent conduct until he became overwhelmed with the intensive and simultaneous demands of the Doctor of Pharmacy Program and the responsibilities of looking out for his family's welfare.  He was provided with a sheltered upbringing and then thrust into a new life and a new country.  He became dependent on others who knew this society and showed the outward signs of success upon which this country is based.  His first major career decision upon arriving was to enter the military.  While it provided him with a great opportunity to serve, it also sheltered him further from life.  The unexpected death of his father certainly had a tremendous impact upon his life.  In an instant, the defendant became responsible for not just himself but for the welfare of his entire family.  Upon separation from the military, the defendant returned to those who provided guidance upon his arrival in this country.  It is neither unfair nor outlandish to say that Odelugo took full advantage of the defendant's naivety and, as the government knows he did or attempted to do with others, he abused and exploited the trust that the defendant bestowed upon him.  As a result, the defendant lost his moral compass, became blind to the evidence of fraud around him, and engaged in unacceptable criminal conduct.   His crimes are, however, completely uncharacteristic when viewed in the context of his entire productive adult life, which is another reason why the defendant respectfully submits that this Honorable Court should grant a substantial variance below the advisory range.

4. *Due to the loss of his educational degree and professional opportunities, the defendant will never be able to commit a future crime of Medicare fraud.*

In fashioning a sentence that adequately deters the defendant from future criminal conduct, it is highly relevant to consider whether the defendant will even be able to commit future crimes like the one for which he is being prosecuted. In *United States v. Olis*, for example, the district court considered that the defendant was substantially incapacitated from committing future crimes of fraud by the loss of his corporate job and professional licenses. *2006 WL 2716048, at 13 (S.D. Tex. Sept.22, 2006) (unpublished)*. In granting a substantial variance below the advisory range, the *Olis* court explained: "Once [the defendant] returns to his family, the chastening effect of any time in prison, the attendant negative publicity, the loss of his job and accounting and law licenses, and the need to provide support for his family will provide adequate deterrence against any potential future criminal conduct." *Id.* Like the defendant in *Olis*, the defendant here will be unable to commit any future crimes of Medicare fraud upon his release from custody. He has been expelled from the Mass College of Pharmacy as a result of his convictions. It is highly unlikely that he will ever be eligible for any comparable graduate program again. He is also statutorily excluded from participating in employment in much of the health care field. While he understands and recognizes that he will likely have to start over from "scratch" once his sentence is completed, a longer than normal sentence is not necessary to incapacitate him, given that his career track is already substantially disabled as a consequence of both his convictions and the term of incarceration he is likely to receive.

### 5. The defendant will be better able to make restitution to his victims if he is sentenced to a short term of imprisonment and long term of supervised release.

In considering the length of a prison sentence, a sentencing court may consider how its

sentence will affect the defendant's ability to make financial restitution. *See* 18 U.S.C. §3553(a)(7) (cataloging "the need to provide restitution to any victims of the offense" as one factor to consider in formulating sentence); *see*, *e.g.*, *United States v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006)* (acknowledging district court's discretion to depart from guidelines to impose probation sentence as the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by non-incarcerated and employed defendant"). In *United States v. Peterson*, for example, the district court's central justification for varying from the guidelines was to facilitate the defendant's payment of restitution. *363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005)*. There, the defendant had stolen checks from his employer, forged signatures on the checks, and deposited them into his sister's bank account. *Id. at 1061*. He pled guilty to bank fraud in the amount of \$81,000. *Id.* The district court elected to grant a variance from the advisory guidelines range of 12 to 18 months imprisonment and instead sentenced the defendant to "one day in prison, followed by a substantial period of community confinement as a condition of five years of supervised release." *Id*. In explaining its variance from the guidelines, the district judge said: "If I had sentenced defendant consistent with the guidelines, he would have lost his job. This would have impaired his ability to repay the money he stole.  I do not suggest that a defendant should receive a break just because he owes restitution. But in the present case, where defendant had a reasonably well-paying job and the restitution amount was manageable, §3553(a)(7) weighed in favor of a sentence that would allow him to remain in the community and working." *Id. at 1062*.

The defendant here is a college-educated, hardworking man and a particularly talented person. Due to his personal charm, likeability, and high energy level, he was extremely successful in all his endeavors until becoming involved with Kings Enterprize. There is every

reason to believe that, even with a felony conviction and even after serving time in prison, he will be able to someday become a productive citizen after his release from prison, (particularly if he is able to re-enter the military thereafter) and be in a position to make substantial restitution to the victims.  If, however, the defendant is sentenced within the advisory guideline range as calculated by Probation, he will not get out of prison until he is close to 40 years old, well past the age where either a career in the military or pursuing entirely new fields of endeavor are viable options.  Though the government in this case is calling for an even longer prison sentence than posited by Probation, they also stress the importance of restitution.  The defendant is very remorseful and wants to devote the remainder of his working life to making amends to the victims.  He has already made efforts to demonstrate his remorse through his cooperation during the eleven month long criminal investigation by HHS agents.  In fashioning an appropriate sentence, it is respectfully submitted this Court should seek to maximize, rather than eliminate, the defendant's ability to be able to get "back on track" and place himself in a position to make the restitution the government is demanding.

## CONCLUSION

For all the foregoing reasons, the defendant respectfully asks the Court to impose a sentence of **24 months in prison at a federal camp** within the northeastern United States.  The defendant further asks the Court to allow him **an opportunity to self-surrender** to the custody of the United States Marshal four weeks after his sentencing before this Court in order for him to attend to the needs of his mother and organize his personal affairs, prior to beginning his sentence.

Dated: July 19, 2010             Respectfully submitted,

                              KINGSLEY T. EZE
                              by his attorneys,

                              _/s/ *R. Bradford Bailey*_
                              R. Bradford Bailey, BBO#549749

                              _/s/ *Charles E. Dolan*_
                              Charles E. Dolan, BBO#546344

                              DENNER PELLEGRINO, LLP
                              Four Longfellow Place, 35th Floor
                              Boston, MA 02114
                              (617) 227-2800
                              bbailey@dennerpellegrino.com
                              cdolan@dennerpellegrino.com

## **Certificate of Service**

I, R. Bradford Bailey, hereby certify that by filing the foregoing *Sentencing Memorandum* via the CM/ECF system on this the 19th day of July 2010, I caused a true copy of the same to be served electronically upon all parties or record registered with CM/ECF.

                              _/s/ *R. Bradford Bailey*_
                              R. Bradford Bailey